United States District Court
Middle District of Pennsylvania

Jeremy Pinson,
          Plaintiff,

v.                                     Case No. 25-CV-0209-JFS

United States of America,
Lieutenant K. Ackley,
Federal Bureau of Prisons,          First Amended Complaint
          Defendants                 FILED
                                     SCRANTON

                                     JUN 05 2025

          A. Jurisdiction/Venue   PER _____
                                     DEPUTY CLERK

1. Jurisdiction is asserted pursuant to 28 U.S.C. 1331 (federal question), 1346(b) and 2671-80 (Federal Tort Claims Act and/or "FTCA"), 2201-02 (Declaratory Judgments); Bivens 403 U.S. 388 (1971).

2. Venue is asserted proper as the acts and/or omissions of defendants occurred in Allenwood PA which is within the Middle District of Pennsylvania, as is Lewisburg, PA the location of other acts or omissions. See: 28 U.S.C. 1391(e)

          B. Parties Involved

1. Plaintiff Jeremy Pinson (Reg. No. 16267-064) was a federal prisoner housed at USP Allenwood, or transported to the Medical facility in Lewisburg, PA at all times relevant to this action. Plaintiff is housed at the FCI Butner Medium I, P.O. Box 1000, Butner, NC, 27509 at the time of the filing of this pleading.

2. Defendant United States of America (hereinafter "United

- 1 -

States") is the proper party defendant in an FTCA action and is sued under the FTCA only.

3. Defendant Lieutenant K. Ackley is the sole individual defendant herein and was employed as a Lieutenant by the Federal Bureau of Prisons at USP Allenwood at all times relevant to this Complaint and is the sole defendant sued under Bivens, 403 U.S. 388 (1971).

4. Defendant Federal Bureau of Prisons ("BOP" hereinafter) is a United States government agency sued for both declaratory and injunctive relief herein in its official capacity as contemplated by 5 U.S.C. 702.

## C. Causes of Action

1. Claim One: Negligence (FTCA Claim);
2. Claim Two: Assault and Battery (FTCA Claim);
3. Claim Three: Intentional Infliction of Emotional Distress ("IIED" hereinafter)(FTCA Claim);
4. Claim Four: Violation of the Eighth Amendment to the Constitution of the United States;
5. Claim Five: Violation of the First Amendment to the Constitution of the United States;

# D. Supporting Facts

1. For years, people incarcerated in the custody of the defendant BOP have been subjected to rampant Ongoing sexual abuse that continues to this day. Plaintiff has endured horrific sexual abuse and exploitation, at the hands of a rogue supervisor who was never meaningfully investigated for the allegation of sexual abuse against him and as a result never faced any discipline for raping her. This was, unfortunately, commonplace. The BOP has been aware of these problems for decades and has failed, and continues to fail, to take action to protect those in its care by preventing and addressing rampant staff sexual Misconduct.

2. Officers, supervisors, and leadership throughout BOP were and continue to be aware of the ongoing sexual abuse and not only fail to prevent it but also fail to affirmatively take actions that allow abuse to continue. Staff protect their abusive colleagues by failing to investigate claims or respond meaningfully, and by retaliating against those who report abuse.

3. People incarcerated in the BOP have no safe ways to report sexual misconduct. Survivors must frequently report to the same staff members who abused them or who allowed the abuse to occur. When survivors report abuse to facility staff, their experiences are often not kept confidential. When survivors attempt to use the "confidential" email system to report to outside authorities at the U.S. Department of Justice they must do so on public computers in full view of staff and other incarcerated persons.

Those reports are often, in turn, sent back to the reporting inmate's facility's officials. As a result survivors frequently face immediate retaliation, including placement in solitary confinement, repeated and unjustified strip and cell searches, and transfer to other facilities away from their families and support systems. This pervasive retaliation deters many survivors from reporting their abuse.

4. This dangerous state of affairs has continued unabated across multiple decades and multiple administrations. In recent years, staff sexual abuse at multiple institutions has been so severe that a number of sprawling criminal investigations, multiple Congressional inquiries, and national media attention. The United States Senate's Permanent Subcommittee on Investigations devoted multiple hearings to addressing its causes and impact, and issued a report in December 2022 describing the abuse as "horrific" and Defendant BOP's investigative practices as "seriously flawed," and concluding that "BOP Management failures enabled continued sexual abuse of female prisoners by BOP's own employees." (See: S. Permanent Subcomm. on Investigations, Rep. on Sexual Abuse of Female Inmates In Federal Prisons 1 (Dec. 13 2022)(hereinafter "Senate Report").

5. Numerous survivors have also filed civil actions against the BOP and abusive officials in recent years, and dozens more are expected to be filed in the near future. Over $25,000,000.00 in taxpayer monies have been spent on settling such claims since 2020.

7. In the wake of the federal criminal investigations and the resulting public scandal, the Warden and numerous other lesser ranking officials at more than 7 prisons have been removed from their positions. But these actions were not even initiated by the BOP, and the systemic issues which allowed BOP employees' grievous sexual abuse remain deeply entrenched — subjecting everyone detained in the BOP to extreme risk of serious emotional and physical harm. The risk of sexual abuse is compounded by systemwide barriers to accessing counsel, a lack of safe and private reporting mechanisms, ongoing retaliation for reporting, and denial of access to medical and mental health care for survivors and those otherwise affected by the ongoing abuse.

8. Despite its awareness of these longstanding problems, BOP has failed to take critically needed action, including failing to (a) adequately hire, train and supervise staff to prevent their ongoing sexual misconduct and abuse of power; (b) implement a confidential and reliably available method for individuals to report abuse to fully independent outside authorities who are not employed by the BOP; (c) properly investigate claims of abuse, (d) cease the policy and practice of placing individuals who report sexual abuse into segregated confinement, (e) address rampant retaliation against survivors, including but not limited to punitive segregation assignment, cell and strip searches, and transfers, which harm survivors and deter

others from reporting (f) ensure that officers who have substantiated claims of sexual assault and harrassment against against them are promptly fired and not permitted to return to BOP employment; (g) provide constitutionally adequate medical and mental health care to survivors of sexual abuse; (h) provide timely and consistent access to confidential legal calls and attorney visits; (i) provide survivors a process to assist with compassionate release petitions (j) install fixed cameras in all areas where abuse is known to occur and properly monitor and maintain the fixed cameras that do exist; and (k) address the increasingly dire living conditions that contribute to ongoing sexual exploitation of incarcerated persons.

9. BOP's inadequate systems for preventing, detecting, investigating, and responding to sexual abuse put incarcerated people at substantial risk of serious harm from sexual assault, harrassment, and retaliation by staff. The 8th Amendment prohibited prison staff from engaging in sexual abuse or sexual conduct with the people in their custody. See, Bearchild v. Cobban, 947 F.3d 1130, 1144 (9th Cir. 2020) ("We now hold that a prisoner presents a viable Eighth Amendment claim where he or she proves that a prison staff member, acting under color of law and without penological justification, touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner."). It

is well established that individuals May sue to enjoin Constitutional violations directly under the Constitution. See, Sierra Club v. Trump, 929 F.3d 670, 694 (9th Cir. 2019)("Plaintiffs may bring their challenge through an equitable action to enjoin unconstitutional official conduct or under the judicial review provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. 701 et seq., as a challenge to a final agency decision that is alleged to violate the Constitution, or both"); Farmer v. Brennan, 511 U.S. 825, 846 (1994)("If the Court finds the Eighth Amendment's subjective and objective requirements satisfied [with regard to a federal prisoner], it may grant appropriate Injunctive relief."

10. The BOP's failures — and the resulting pervasive culture of sexual misconduct and retaliation against reporting survivors of sexual misconduct — cause ongoing harm to the people incarcerated at the facility. These failures are in violation of the Eighth Amendment, and constitute numerous torts for which the United States is liable for the sexual abuse she suffered at the hands of one of its staff whom it would protect from meaningful investigation and accountability ~~for~~ his sexual abuse, also the United States is liable for its failure to provide post-assault medical and mental health care for the severe mental and emotional trauma that she endured at the hands of BOP's rogue lieutenant. This Complaint seeks to remedy these failures on behalf of herself and to compensate her for the immense harm she has suffered.

11. Prison staff sexual abuse of incarcerated people is criminal

7

and violates 18 U.S.C. 2243, 2244.

12. The Prison Rape Elimination Act ("PREA") of 2003 required the Attorney General to promulgate rules to prevent sexual abuse in prison facilities. 34 U.S.C. 30307. In 2012, the U.S. Department of Justice issued regulations designed to "prevent, detect, and respond to prison rape." See, 28 CFR §115, 77 Fed. Reg. No. 119 (June 20, 2012). These regulations were immediately binding on BOP facilities.

13. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance" policy for sexual abuse and sexual harassment; prevention, reporting, detection, and response to such behavior; "the right of inmates to ... be free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of sexual abuse in confinement, and "common reactions of ... victims"; and, "how to avoid inappropriate relationships with inmates." 28 CFR 115.31(a). The training must be "tailored to the gender of the inmates at the employee's facility," and the agency must conduct a refresher training on PREA standards every two years. Id. at 115.31(b)-(c). In off years from the training, "the agency shall provide refresher information on current sexual abuse and sexual harassment policies." Id. at 115.31(c).

14. The regulations greatly restrict the circumstances whereby officers may view incarcerated people's naked bodies. They state that facilities "shall not conduct cross-gender strip searches or cross-gender visual body cavity searches ... except

8

in exigent circumstances or when performed by medical practitioners." Id. at 115.15(a). Facilities must document all such searches. Id. at 115.15(c). Facilities are also required to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." Id. at 115.15(d).

15. For positions in which someone "may have contact with inmates" PREA prohibits the hiring or promotion of anyone who has engaged in sexual abuse of incarcerated people or has been adjudicated to have been sexually abusive in the community." Id. at 115.17(a). However, BOP has interpreted these rules to not prohibit BOP from promoting or transferring staff members who were found to have sexually harassed incarcerated people in their custody. See, Program Statement 5324.12 at 20-21.

16. PREA regulations also mandate staff reporting. BOP "[must] require all staff to report immediately... any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 CFR 115.61(a).

17. PREA regulations mandate that BOP provide "multiple

internal ways" for incarcerated people to "privately report" sexual abuse, sexual harrassment, and retaliation. 28 CFR 115.51(a). In addition, BOP is required to "provide at least one way for inmates to report abuse or harrassment to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward inmate reports of sexual abuse and sexual harrassment to agency officials, allowing the inmate to remain anonymous upon request." Id. at 115.51(b). BOP is required to "accept reports made verbally, in writing, anonymously, and from third parties and shall promptly document any verbal reports." Id. at 115.51(c). BOP is also required to provide incarcerated people "with access to outside victim advocates for emotional support services related to sexual abuse" and must "enable reasonable communication between inmates and these organizations and agencies, in as confidential a manner as possible." Id. at 115.53(a).

18. Per PREA regulations, administrative investigations of alleged sexual abuse by a staff member or incarcerated person are required to proceed "promptly, thoroughly, and objectively for all allegations, including third party and anonymous reports." 28 CFR 115.71(a). Investigators must be specially trained in sexual abuse investigations and must "gather and preserve direct and circumstantial evidence" including "interviewing" alleged victims, suspected perpetrators, and witnesses" and "shall review prior complaints and

10

reports of sexual abuse involving the suspected perpetrator." Id. at 115.71 (c)-(b). The agency is prohibited from determining an alleged victim's credibility based on their "status as inmate or staff." Id. at 115.71 (e). Investigations are further required to "include an effort to determine whether staff actions or failures to act ~~contributed~~ contributed to the abuse." Id. at 115.71 (f). "The departure of the alleged abuser or victim from the employment or control of the facility or agency shall not provide a basis for terminating an investigation." Id. at 115.71 (j).

19. Substantiated allegations of potentially criminal conduct must be referred for prosecution and the agency must retain written reports of investigations for five years beyond the end of the staff member's employment. Id. at 115.71 (h)-(i). After investigating an incarcerated person's allegation that they were abused, BOP must inform that person of whether their allegation was found to be substantiated, unsubstantiated, or unfounded, even if the ~~initial~~ investigation was completed by another agency. Id. at 115.73 (a), (b). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. Id. at 115.76 (b).

20. PREA also includes measures designed to prevent staff retaliation following incarcerated persons'

reports of abuse. PREA requires that BOP establish
a policy to prevent [incarcerated persons] retaliation,
and that staff monitor retaliation, provide "emotional
support services for inmates ... who fear retaliation,"
and monitor for at least 90 days the conduct and
treatment of incarcerated people who report abuse.
Id. at 115.67. These protective measures include
strict limits on the use of administrative segregation.
The regulations provide: "Inmates at high risk for
sexual victimization shall not be placed in involuntary
segregated housing unless an assessment of all
available alternatives has been made, and ... there
is no available alternative means of separation
from likely abusers. If a facility cannot conduct
such an assessment immediately, the facility may"
hold the individual in segregated housing for "less
than 24 hours while conducting the assessment."
Id. at 115.43(a). Any incarcerated person placed
in protective custody for this purpose "shall
have access to programs, privileges, education and
work opportunities to the extent possible." Id.
at 115.43(b).

21. BOP has failed to adhere to PREA regulations.
From inadequate training, to lack of confidential
reporting mechanisms and access to outside support
services, to failures in administrative investigations,
widespread misuse of administrative segregation, and
rampant staff retaliation, its actions and failures

to act have created an environment that has exposed, and continues to expose, the people in its custody to an unconscionable risk of sexual violence.

22. As one survivor of staff sexual abuse remarked at the trial of a former Warden, Ray Garcia, PREA "really doesn't exist in" the BOP. (Transcript at Pg. 401, United States v. Garcia, Case No. CR-21-00429-YGR (N.D. Cal. Nov. 29, 2022)).

23. In 2004, the DOJ's Office of the Inspector General ("OIG" hereinafter) completed a review of BOP's staff disciplinary process and found significant deficiencies. In particular, the report found that more than 20% of cases with sustained allegations of misconduct were receiving little to no discipline, despite the inclusion of sexual misconduct and the egregious nature of the other conduct at issue. (See: Subcommittee On National Security, Majority Staff Memorandum, "Independent Investigations and Employee Discipline at the Bureau of Prisons" (Jan. 2, 2019) (discussing "Review of the Federal Bureau of Prisons' Disciplinary System") (OIG Report No. I-2004-008) (2004)) (hereinafter "National Security Memo").

24. The following year, the DOJ's OIG issued another report specifically focused on deterring sexual abuse by BOP staff. In that report, Kathleen Hawk Sawyer — the Director of the BOP from 1993 to 2003 — stated that

Sexual abuse of inmates was the biggest problem she faced as Director of BOP and acknowledged that such abuse "can significantly harm inmates — the very people the federal government charges the BOP with protecting." The report noted that the BOP "recognized that staff sexual abuse is a significant problem within its institutions," concluded that laws intended to deter sexual abuse by BOP staff members were deficient in critical ways. (OIG, "Deterring Staff Sexual Abuse of Federal Inmates" (April 2005)).

25. In 2019, the Congressional House Subcommittee on National Security reported that widespread misconduct in the federal prison system was tolerated and routinely covered up or ignored, including senior officials. (See National Security Memo at 1). To that end, the Subcommittee found that "individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted, and even allowed to retire with a clean record and full benefits before any disciplinary action could apply." The report also observed that problems had plagued the BOP's disciplinary process for years and noted that the 2004 report by DOJ Office of the Inspector General had found similar fifteen years before. (National Security Memo at 9).

26. In early 2022, the Associated Press ("AP") investigated a federal prison in Dublin, CA and found that, from a review of internal BOP documents, court documents, and statements

14

from incarcerated persons, as well as interviews with staff. The investigation "found a permissive and toxic culture" that had "enable[ed] years of sexual misconduct by predatory employees and cover-ups that have largely kept the abuse out of the public eye."

27. The AP Investigation also shed light on administrators who were installed at FCI Dublin despite a long history of misconduct in the BOP. That misconduct encompassed extensive physical abuse of incarcerated people, including an incident where he held down a person in his custody while another BOP officer sexually assaulted that person. (See, Michael R. Sisak and Michael Balsamo, "AP Investigation: Prison Boss Beat Inmates, Climbed Ranks" (Dec. 9, 2022)).

28. In the summer of 2022, Deputy Attorney General Lisa Monaco ordered the creation of a DOJ Working Group "to review the Department's approach to rooting out and preventing sexual misconduct by BOP employees." The Working Group issued a report in November 2022, which included over fifty specific recommendations to better protect the safety and wellbeing of those in BOP custody and hold accountable those who abuse positions of trust.

29. The Working Group observed "the need for immediate actions to address the Department's approach to

Sexual misconduct perpetrated by BOP Staff, as well as the importance of further review to consider longer term — and more systemic — changes." (Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons, Nov. 2, 2022, available at https://www.justice.gov/dq/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf). (hereinafter "DOJ Report"). The Working Group also reported that "BOP has received hundreds of complaints of sexual abuse perpetrated by its employees over the past five years." It further concluded that, even if some of those complaints were not meritorious, "the volume alone is a strong signal of the need for attention to this problem." (id. at 4).

30. As with the AP Investigation, the Working Group heard from stakeholders, who "raised troubling allegations of a culture of permissiveness toward staff misconduct and retaliation against victims who report abuse." It reported that "internal and stakeholders all emphasized that prevention [of sexual abuse] begins with changing [BOP] culture ... to promote a safer ... environment." (id. at 5). The Working Group also noted that "during listening sessions, advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator." (id. at 5). Several people mentioned that BOP staff tried to

deter individuals from reporting abuse by threatening to restrict access to their children." (id. at 12).

31. The Working Group also found problems with BOP investigation policies as well, namely that "BOP has assigned Special Investigative Services (SIS) lieutenants to conduct intake of allegations of sexual misconduct," but that "SIS officers are usually corrections officers who rotate in and out of that position without specialized sex-crime or trauma-informed training." This arrangement means that intakes are often conducted in a harmful or traumatic manner and that survivors of sexual abuse are deterred from reporting because "SIS officers may be — or appear to victims to be— friends or colleagues of the alleged perpetrators, creating at least the appearance of a conflict of interest." (id. at 15).

32. The Working Group also criticized the fact that Wardens have been in charge of whether allegations of misconduct will lead to disciplinary investigations, an arrangement that has been referred to as "putting the fox in charge of the hen house." (See: Benjamin Tschirhart, "With Fox In Charge of the Henhouse, Almost All [Allegations] of Misconduct Against BOP Staff Result In No Discipline," Prison Legal News (Mar. 2023).

33. Taken together, the problems identified by the DOJ Working Group have reduced accountability for BOP

17

staff misconduct and contributed to a toxic culture in which sexual abuse of incarcerated people is institutionally tolerated and frighteningly common.

34. A month after the Working Group issued its report, the United States Senate's Permanent Subcommittee on Investigations concluded its own months' long investigation into BOP staff sexual abuse, and issued a report entitled: "Sexual Abuse of Female Inmates in Federal Prisons." The Subcommittee's report made clear that sexual abuse of incarcerated people is a significant, widespread, decades long problem in BOP facilities generally and that numerous survivors have "endured ongoing abuse for months or years."

35. The Subcommittee further found that "BOP management failures enabled continued sexual abuse" and that BOP's investigative practices are "seriously flawed" with "a backlog of 8,000 internal affairs cases, including at least hundreds of sexual abuse cases," including some that had been pending for more than five years. (Senate Rep. at 25).

36. In a Memorandum to the BOP Director, the Inspector General noted that "the BOP will not rely on inmate testimony to make administrative misconduct findings and take ~~these~~ disciplinary action against BOP employees, unless there is evidence aside from inmate testimony that independently establishes ████ the misconduct

18

such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject." (See: Management Advisory Memorandum from Michael E. Horowitz, Inspector General, U.S. Department of Justice to Colette S. Peters, Director, Federal Bureau of Prisons (Oct. 12, 2022) available at https://oig.justice.gov/sites/default/files/reports/23-001.pdf").

37. The Inspector General warned that BOP's reluctance to credit survivor testimony "enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." (id. at 3). It also "likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences." (id. at 4).

38. Instead of disciplining staff over allegations of misconduct, BOP routinely either takes no action or transfers them to other institutions without further recourse, allowing misconduct to continue at the new facility. Other times, staff deemed responsible for misconduct are permitted to retire (with full benefits) before any disciplinary action can apply. (See: National Security Memo at 1). And criminal punishment for action involving sexual abuse of incarcerated people is even

19

less likely than administrative punishment. When a BOP employee is officially accused of wrongdoing, there is only a three-tenths of one percent likelihood that the person will be criminally convicted. (See: Benjamin Tschirhart, "With "Fox In Charge of the Henhouse," Almost All Misconduct Accusations Against BOP Staff Result in No Discipline," Prison Legal News (Mar. 2023)).

39. Plaintiff Jeremy "Grace" Pinson was transferred to USP Allenwood Jan. 2, 2024 from USP Tucson for an involuntary placement in the "Secure Administrative Unit" (hereinafter "SAU"). Because construction of the SAU was incomplete as of Jan. 2, 2024 Plaintiff was housed in the "Special Housing Unit" or "SHU" until March 2024.

40. At a medical examination in Jan. 2024 Dr. Charles Ackley referred Plaintiff to BOP's Utilization Review Committee ("URC") which approved Plaintiff for a Mammogram at a hospital in Lewisburg, PA.

41. Following completion of the mammogram, Plaintiff was recommended by medical personnel at the hospital for a breast biopsy to determine whether masses found in her right breast were benign or malignant. The request was forwarded to Dr. Charles Ackley who referred the recommendations to the URC which approved Plaintiff for the procedure.

20

42. Prior to being escorted to a local Medical center in Lewisburg, PA plaintiff had filed a lawsuit against the BOP seeking a preliminary injunction enjoining BOP's use of male staff members to (a) pat search plaintiff (b) strip search plaintiff, as a result of her (i) transgender status and (ii) gender identity, (iii) diagnosis of Gender Dysphoria. (Pinson v. Carvajal et al, Case No. 22-CV-00298-RM (D. Ariz.) (hereinafter "Pinson I case").

43. Following a Feb. 14, 2024 filing by BOP staff member Timethea Pullen in the Pinson I case, Plaintiff was restricted from being pat or strip searched by BOP Male staff per Warden David Christensen who had approved Plaintiff for such an exemption following the entry of Doc. 115 in the Pinson I case which specifically held BOP's use of male staff to view Plaintiff's nudity violated her constitutional rights.

44. Based solely upon the Feb. 14, 2024 Pullen declaration, the U.S. District Judge in the Pinson I Case denied Plaintiff's preliminary injunction in part as mooted by BOP's voluntary cessation of using male staff to pat search or view plaintiff naked at any time including strip searches.

45. Despite Plaintiff's exemption from male pat and strip searches, administrative staff at USP Allenwood assigned 4 male staff to escort Plaintiff to her

21)

breast biopsy including 3 male officers and a sole Lieutenant - defendant K. Ackley. These staff knew or should have known that by assigning male staff to escort plaintiff to a local hospital would require those staff to not only strip search plaintiff but to also view her nude body during the breast biopsy procedure.

46. On the morning of her breast biopsy, plaintiff was ordered by Ackley and the other 3 Escort Trip officers to strip nude and expose her breasts, genitalia and anus to defendant Ackley and the 3 other male officers.

47. Upon arrival to the Medical Center in Lewisburg, PA plaintiff was asked to strip nude first and then to dress in a medical gown. At this point, defendant Ackley ordered the 3 fellow escort trip officers to exit the room where the biopsy was to be performed and personally observed Plaintiff stripping nude and dressing in the gown provided. The breast biopsy was performed without incident by medical staff at the Medical Center in Lewisburg, PA.

48. Following the biopsy, Ackley ordered plaintiff to perform fellatio upon him while wearing both a loaded firearm and the activator to a 50000 volt stun device which was affixed to plaintiff. The plaintiff performed fellatio on Ackley but did

so solely because she feared Ackley might shoot or electrocute her if she did not do so. During the sexual abuse Plaintiff cried tears and gagged several times. Ackley ejaculated into a napkin that he disposed of into a trash can.

49. During the trip from the Medical center in Lewisburg, PA back to USP Allenwood, the Plaintiff elected to remain silent fearing retaliation by Ackley.

50. The SAU at USP Allenwood was supervised most days and evenings by a Lieutenant. One such staff member, Lt. Tyler, was formerly employed as an officer at USP Tucson where he had been assigned to Plaintiff's unit from 2018 to 2020.

51. Plaintiff had previously levied staff misconduct allegations against Lt. Tyler at USP Tucson that resulted in an internal investigation by BOP into then-Officer Tyler.

52. Plaintiff first reported Lt. Ackley's sexual abuse during a shift in the SAU manned by Lt. Tyler. Because plaintiff was secured in her cell 23-24 hours a day, her report to Lt. Tyler was written on a piece of lined notebook paper and stated Plaintiff needed medical attention because she had been raped by a staff member.

23

53. PREA regulations, 28 CFR part 115 et seq., clearly outlined Lt. Tyler's duties as the "first responder" to Plaintiff's allegations against Lt. Ackley. But Lt. Tyler did not proceed "promptly, thoroughly and objectively" as required by 28 CFR 115.71(a). Lt. Tyler instead left USP Allenwood at the end of his shift without forwarding Plaintiff's allegations against Lt. Ackley to anyone else within the BOP.

54. Because Lt. Tyler failed to forward Plaintiff's sexual abuse allegations consistent with his responsibilities under 28 CFR 115 et seq. no administrative BOP investigation of Ackley began until all forensic evidence of Ackley's sexual assault were no longer available for collection and preservation for use in any administrative or criminal action.

55. Plaintiff then waited until a session with her SAU psychologist to report Lt. Ackley's sexual abuse after Lt. Ackley threatened her with serious harm and continued incarceration past her release date after Ackley observed Pinson in a confidential interview with an SIS Officer named Butler. Ackley wrote Plaintiff an Incident Report charging her with a BOP Prohibited Act while Plaintiff was being interviewed by Butler and told Plaintiff that he could accuse her "of anything" and that she could "expect to be found guilty of whatever" he wrote.

56. Plaintiff's psychologist reported the allegations against Ackley, which finally initiated an investigation into Lt. Ackley by SIS investigators Butler and later Lt. Reedy.

57. Lt. Reedy told Plaintiff on several occasions when interacting with her that he thought "all transgender inmates file fake PREA" allegations and that he viewed his position in SIS as enabling him "to protect my staff" prior to the investigation into Lt. Ackley began. The investigation into Lt. Ackley included interviews of Plaintiff by SIS Butler and Reedy during which both Butler and Reedy asked, and then belligerently demanded, Plaintiff to withdraw her PREA allegations against Lt. Ackley.

58. Prior to her allegations against Ackley, Plaintiff had complained to BOP's Transgender Executive Council via electronic messaging that USP Allenwood staff including Lt. Reedy, were not taking PREA seriously and were allowing perpetrators of sexual misconduct to continue their misconduct towards Plaintiff. The Transgender Executive Council forwarded Plaintiff's complaints to BOP's Office of Internal Affairs ("OIA") which took no action upon them in the one and a half months between the original complaints and Ackley's sexual abuse of Plaintiff.

59. Plaintiff's complaints forwarded to OIA were also forwarded by Plaintiff to DOJ's OIG which also took no action known to Plaintiff in the weeks and months prior to Ackley's sexual abuse of Plaintiff.

60. Plaintiff's complaints forwarded to OIA were also forwarded to the Warden of USP Allenwood which also took no action known to Plaintiff in the weeks and months prior to Ackley's sexual abuse of Plaintiff.

61. Neither the BOP, its OIA, nor OIG, nor the Warden of USP Allenwood, took any steps to refer the Plaintiff's allegations against Lt. Ackley to the Federal Bureau of Investigation and/or United States Attorney's Office for investigation that would lead to a prosecution of Ackley for sexual assault.

62. Following her report of Ackley's sexual abuse, BOP waited more than 8 hours to medically examine the Plaintiff relating to her PREA accusations. The exam was initiated by Musser, a male staff member who was responsible for distribution of daily medications, and 3 male staff members under the immediate supervision and observation of Lt. Fry who was also male. Lt Fry ordered the medical exam to be conducted with Plaintiff restrained by handcuffs affixed to wrists behind her back and leg shackles affixed to her ankles. Prior to the rape, no staff

26

member had ever shackled Plaintiff during an escort to a medical exam.

63. During the medical exam by Musser, the 3 male staff accompanying Lt. Fry dug their fingers into Plaintiff's biceps region of her arm so hard that she had finger shaped bruises on her arms the following day for over a week in duration.

64. Plaintiff was asked by Musser if he, Fry and the other 3 male staff could strip search her to perform the PREA exam and Plaintiff refused citing the Pullen declaration in the Pinson I case which stated the Warden approved Plaintiff for an exemption from male staff viewing her nude body or pat searching her. Musser then terminated the exam stating "its us or nobody" when Plaintiff asked that female staff conduct the exam or be present for Musser's exam instead of Fry and the 3 male officers.

65. Following the incident, Plaintiff obtained an SF-95 Claim for Damage, Injury or Death (hereinafter "SF-95 Claim") form upon which she provided BOP's NorthEast Regional Counsel a full factual description not just of Ackley's sexual assault, but also including all allegations outlined in the preceding 64 paragraphs using the lawsuit filed in Cal. Coal. for Women Prisoners et al. v. United States, Case No. 23-CV-4155 (N.D. Cal.)

27

as a model for providing the Regional Counsel a full description of the allegations of rampant staff on inmate sexual abuse, the DOJ Report, the OIG Memo and reports, the DOJ Working Group Report and Recommendations, as well as affidavits from other BOP inmates in the SAU.

66. BOP Program Statements and regulations outline how BOP assigns an investigator to each SF-95 Claim for investigation and preparation of a report which BOP then uses to settle or deny SF-95 Claims.

67. The investigator assigned to Plaintiff's SF-95 Claim never interviewed Plaintiff nor made any other attempt to gather information or evidence from Plaintiff relating to her SF-95 Claim which could corroborate her allegations.

68. Plaintiff experienced depression, anxiety, PTSD, and suicidal ideation following Ackley's sexual abuse and reported these symptoms to multiple BOP staff from officers assigned to the SAU to her psychologist. No staff member took any known actions to help Plaintiff with her depression, anxiety, PTSD and suicidal ideation from May 2024 until she departed USP Allenwood on Oct. 7, 2024. Her psychologist, Dr. Greene, told Plaintiff repeatedly he would not discuss the sexual assault's impact on plaintiff due to his desire to remain on friendly terms with his

28

colleagues at USP Allenwood who were openly angry
and hostile regarding Plaintiff's accusations against
Ackley.

69. In a separate SF-95 Claim, plaintiff wrote: " I believe
[an officer] when he brags of all the sadistic ways that
he could harm me, physical or otherwise, and would
be protected by the other staff who work here all the way
up to the Warden. The BOP has had an explosion of such
behavior nationwide as described in lawsuits ranging
from California Coalition for Women Prisoners v. United
States, Case No. 23-CV-4155 (N.D. Cal.) to Beaubrun et
al. v. United States, Case No. 19-CV-00615 (M.D. Fla.) and
the central themes of those cases is that BOP staff
are able to get away with sexually abusing inmates
and facing no consequences. I would not feel safe
reporting Reese at ALP for a multitude of reasons.
Here are some examples:
1. Inmate [redacted] attempted to file a PREA complaint
   against officer [redacted] and the staff (a) failed
   to treat it as required under existing protocols,
   (b) revealed to me that [redacted] filed the
   PREA against [redacted] to label him a snitch;
2. Upon my arrival to ALP a psychologist and SIS
   technician told me if I had a sexual abuse or
   harassment issue 'dont file a PREA, just talk
   to us and we'll work it out';
3. I have witnessed multiple staff 'sex playing'
   with inmate [redacted] even in front of their

29

immediate Supervisor, and were not reported to OIG or OIA as required by Program Statement(s) 1210.25 and 3420.11 ;

4. Because of fraternization, nepotism, and related factors the staff have created a 'family like' culture and Ive witnessed officers like [redacted] tell inmate [redacted] following an argument 'you realize we are bored as fuck and can fuck your whole life off for the next 6-months right?' I have Witnessed the repeated examples of this Staff culture and am 100% certain that reporting a Staff sexual abuser at the institution would trigger immediate, across-the-board retaliation by staff, which could result in my being physically or otherwise harmed." This SF-95 Claim was received by BOP's Regional Counsel in Philadelphia, PA on June 6, 2024 despite having been mailed to him on April 30, 2024. No BOP staff member ever spoke with Plaintiff about her April 30, 2024 SF-95 Claim.

70. Following the Medical exam with Lt. Fry, Plaintiff filed another OF-95 Claim with the Regional Counsel which stated in part:
"I also believe the Executive Staff including Captain Jarrett, Associate Wardens Wertman and Miller are violating the Standards of Employee Conduct by placing Lieutenant Fry in a Supervisory position over me after they know that I reported him for trying to coerce me into removing my clothing under duress by using

30

intimidation tactics and threat of force. I am the only transgender inmate in the institution with in-writing restrictions from the Warden prohibiting all male staff from performing strip searches of me and Lt. Fry did so in a particularly egregious moment during a PREA examination conducted days after I had reported Lieutenant Ackley for the third time for raping/sexually assaulting me using a deadly weapon to coerce/intimidate me as well as the presence of a non-lethal electrocution device, affixed to my body to get me to perform fellatio upon him. During and after both the first and second attempts to report Lieutenant Ackley USP Allenwood staff had completely failed to follow their PREA-first responder duties altogether significantly delaying any and all inquiry into Ackley's crime and sexual abuse of me. Thus, when staff finally did do a PREA exam and chose all-male staff to conduct it it was inappropriate of Executive Staff to put Lt. Fry into a supervisory role knowing I would be asked or compelled to remove my clothing in spite of my Feb. 2024 Female-only visual/strip search exception... These Executive Staff have exhibited repeatedly a total lack of care and concern for the 'zero-tolerance' posture of BOP's PREA regulations as well as basic common sense..." The BOP and its Regional Counsel assigned an investigator to this SF-95 claim who conducted no interview of Plaintiff to gather information and/or evidence relating to the "Basis of Claim" that the

31

Plaintiff submitted on this second of 3 related SF-95 Claim forms plaintiff submitted.

71. On an SF-95 Claim form dated June 30, 2024 Plaintiff wrote in the "Basis of Claim section:

"on a date in May 2024 when I was on a medical trip Lieutenant K. Ackley asked me to perform fellatio upon him and then I did as I was fearful he could use my rejection as an excuse to use the firearm in his holster loaded with live ammunition or to activate the electrocution device that had been involuntarily affixed to my body by Ackley... After explaining these facts to Dr. Green, who stepped out of the room to relay details to Dr. Powell, ~~who dropped~~ ~~not~~ ~~my~~ ~~the~~ ~~room~~ ~~do~~ ~~something~~ ~~uuuuuuuuuuuuuu~~ I was left in the room to speak to SIS Butler (making those 3 staff the applicable individuals to whom 28 CFR 115.64 applied, 115.62, 115.67 also) Ackley remained in the institution and used a golf-cart like vehicle to drive all my unit officers to my unit that day. No steps were taken to my knowledge to keep Ackley separate from me more permanently. I told Butler that I wanted to speak to the OIG Special Agent nearest to USP Allenwood as well as the OIA Special Agent nearest to USP Allenwood. On 6-27-24 I reiterated to Dr. Green that I felt miserable and depressed and that I truly believed I'd be better off dead. The issue of staff offenders not being held accountable is not unique to me as

32

Attachment A hereto makes abundantly clear which I incorporate into this claim simply to show how the BOP treats victims who are transgender women worse. (Note: BOP also does not take seriously cisgender male victims as Attachment B - Decl. of Juan Vargas; Attachment C - Decl. of Bruce Altenbarger) making things even worse. After I reported Ackley to Butter and Dr. Green, the unit staff began passing my cell stating 'faggot' and 'snitch' to retaliate against me. Then on 6-27-24 Lt. Rivers also cancelled my session with the Chaplain that I have every Thursday by telling me ' you don't even deserve to live and breathe while I'm in charge, you make me sick ... As Attachment A makes plain, BOP denies post-reporting mental health and medical care to sexual assault victims as required by 28 CFR 115.83 and 28 CFR 115.83(a) to (c). I could have committed suicide and noone would have cared, they were too busy protecting Ackley and treating me with loathing and contempt as a group of staff. Moreover, none of the staff involved notified the OIG as required by Program Statement 1210.25."

72. Similarly to the other SF-95 claim forms plaintiff submitted while at USP Allenwood, the June 30, 2024 SF-95 claim was assigned an investigator who never interviewed plaintiff in an attempt to secure additional information and/or evidence.

73. Staff at USP Allenwood, including Ackley, were so confident of evading accountability for any misconduct inmates alleged them to have engaged in that they would antagonize Plaintiff and others at USP Allenwood by stating "Make sure you spell my name right."

74. Plaintiff remained in the SAU from May 2024 until Oct. 7, 2024, during which time she was depressed and suicidal which she reported to her treating psychologist multiple times when she was removed from her cell for weekly Care Level 3 interviews. Each time Dr. Greene, her psychologist, would express a desire to remain uninvolved in any matter relating to defendant Ackley due to his own belief — expressed verbally to Plaintiff that such involvement could trigger retaliation and ostracism for Greene by his BOP colleagues and coworkers.

75. Following entry of a third preliminary injunction on Sept. 80, 2024 in the Pinson I case, the plaintiff was transferred on Oct. 7, 2024 to the Terre Haute United States Penitentiary ("USP Terre Haute") in Indiana.

76. Upon arrival to USP Terre Haute, Unit Manager L. Hughes advised Plaintiff that she was being placed into the Special Housing Unit "upon orders

34

of Regional Director Matevousian" on Oct. 9, 2024. When plaintiff requested to know why she was being placed into SHU Hughes stated that that day Beth Schwartzapfel had published "a very embarrassing story" in Mother Jones Magazine that discussed Plaintiff's history of sexual victimization in BOP custody. Plaintiff had been interviewed by Schwartzapfel by telephone over 30 times while housed at USP Allenwood for the Mother Jones story.

77. Plaintiff was transferred to FCI El Reno, OK on Nov. 1, 2024 and would be transferred to FCI Butner Medium #1 in North Carolina on Feb. 19, 2025. ("FCI Butner #1").

78. At both FCI El Reno and FCI Butner #1 officers verbally told other inmates that Plaintiff was a "snitch" and accused her of "telling on" Ackley and other BOP staff to the OIA/OIG. As a result, at FCI El Reno plaintiff and her mother were both targeted for extortion by gang members who used both inmate phone systems supplied by the BOP and cellular phones, supplied by corrupt BOP staff, to demand payment of U.S. currency threatening that failure to do so would result in plaintiff being assaulted or killed.

# E. Requested Relief

1. Award Plaintiff damages, against the United States, in the amount of $5,000,000.00;

2. Award Plaintiff damages, against K. Ackley, in the amount of $5,000,000.00;

3. Declare that BOP has substantially failed to implement 28 CFR Part 115 et seq. and that such failures contributed to Plaintiff's sexual victimization and subsequent pain and suffering caused by her rape; declare that the aforegoing failure violates the 8th Amendment to the U.S. Constitution;

4. Enter an injunction enjoining BOP from: (a) failing to implement 28 CFR Part 115 et seq. (b) Continuing to permit its staff to retaliate against plaintiff by labelling her a "snitch" or otherwise revealing her allegations against Ackley to other inmates (c) continuing to fail to refer Ackley to the OIG for criminal investigation into his sexual assault of plaintiff.

5. Award plaintiff all costs and fees of this action.

6. Award plaintiff any such additional relief that the Court deems just and proper.

# Verification

I, Jeremy Pinson, hereby declare true and correct all facts pled in Sec. D herein – under the pains and penalties of perjury – pursuant to 28 U.S.C. 1746 on May 22, 2025.

Jeremy Pinson
Plaintiff pro se

37



Jeremy Pinson # 16267-064
Federal Correctional Institution
PO Box 1000
Butner NC 27509

Legal Mail

RECEIVED
SCRANTON
JUN 05 2025
PER _____
_____ DEPUTY CLERK

U.S. District Court
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501

U.S. X-RAY